AMERICAN CREDIT–INDEMNITY CO. v. WIMPFHEIMER et al.

(Supreme Court, Appellate Division, Second Department.   February 19, 1897.)

1. CREDIT-INDEMNITY INSURANCE—FRAUDULENT CONCEALMENT OF INSOLVENCY.
    The failure of the insured in a credit-indemnity policy to inform the insurer at the time of obtaining a renewal that a customer to whom sales had been made by insured during the life of the original policy is insolvent, and that an application for receivers is pending, is not such fraudulent concealment as will avoid the policy, if the renewal was taken at the insurer's instance, and provided that, as to receiverships, the insolvency of a customer should date from the final decree in the receivership proceedings.

2. SAME—RESCISSION—LACHES OF INSURER.
    The right to rescind a credit insurance policy for fraudulent concealment of the insolvency of a customer is barred by laches, if the insurer delays seeking to rescind for five months after notice of insolvency.

Appeal from special term, New York county.
Transferred from the First department.
Action by the American Credit-Indemnity Company of New York against Adolph Wimpfheimer and another. From a judgment dismissing the complaint, plaintiff appeals. Affirmed.
Argued before GOODRICH, P. J., and CULLEN, HATCH, and BRADLEY, JJ.

Otto Horwitz, for appellant.
A. Blumenstiel, for respondents.

GOODRICH, P. J. The plaintiff is a corporation organized under the laws of this state, having its principal place of business in St. Louis, Mo., with a branch office in the city of New York. Its business is the insuring of merchants against loss by insolvency of debt-

ors. This particular class of insurance is of recent origin, but the principles which must govern the construction of the bond on this appeal are not new. The bond or policy issued by it guaranties to the holder indemnity against loss, to the extent of a definite amount mentioned therein, over and above a net loss, which must first be borne by the indemnified, which loss is termed the "initial loss." There are two bonds under consideration. The first was issued in October, 1893, and granted indemnity against loss resulting from insolvency of debtors, as thereinafter defined, to the extent of $7,500, over and above an initial loss of $3,750, first to be borne by the defendants, on their total gross sales amounting to $750,000 between the 1st day of November, 1893, and the 31st day of October, 1894. The second bond was issued in October, 1894, and granted indemnity for $7,500, with the same initial loss, for the period between the 1st day of November, 1894, and the 31st day of October, 1895. The plaintiff brings this action to have the second bond canceled, upon the grounds that the defendants were guilty of false representations to the plaintiff in order to obtain the same, and that the alleged fraud was accomplished by the concealment of material facts. The complaint alleges that just before the expiration of the first bond the defendants applied for a bond against loss upon sales which had been made by the defendants during the life term of the first bond, which were not provable thereunder, but which they sought to have covered by the new bond, and, in order to induce the issuance thereof, the defendants fraudulently and falsely represented that none of the credits extended upon the sales made by them, and which were covered, or intended to be covered, by the first bond, were hazardous or precarious, and that nothing had occurred, or was about to occur, which impaired, or raised any question as to, the solvency of any of the parties covered, or intended to be covered, by either of the bonds; that at the time of this application the defendants knew that the Yonkers Hat Company, to which they had sold upwards of $6,000 worth of goods during the term of the first bond, was insolvent; that receivers had been applied for, and that such receivers were shortly thereafter appointed, of whom the defendant Wimpfheimer was one; that defendants falsely and intentionally concealed and suppressed such facts, in order to induce the plaintiff to issue the second bond; that the plaintiff issued the same in ignorance of these facts; and that immediately upon the discovery of the falsity of these representations the plaintiff tendered back the premium, and demanded the surrender of the bond.

The bonds themselves show that it is the design and intention of the corporation to secure a continuance of business with its dealers by renewals. The first bond provides indemnity on sales made within the term named therein; that no loss shall be proven after its expiration, unless it is renewed at or before its expiration; that loss resulting thereafter upon shipments made during its term may be proven under the renewal; and that the company would issue a renewal on the same terms and conditions, except as to the amount of the initial loss. At the time of the application for renewal, there was some discussion as to the amount of initial loss, but finally it

was fixed at the same amount as in the old bond. The second bond provides that, if it is a renewal, losses occurring during its term on shipments made during the term of the preceding bond can be proven under such renewal. The loss on the sale to the Yonkers Hat Company, therefore, though arising from a sale made during the term of the first bond, was, by the conditions of both bonds, provable under the latter, provided the final decree of dissolution should be entered during the term therein named. There was a manifest element of uncertainty as to the time when this would occur. The alleged concealment arises out of the following facts: On October 26, 1894, Bab, the agent of the plaintiff, called at the defendants' place of business for the purpose of securing a renewal. At this time a petition had been filed for the appointment of a receiver of the Yonkers Hat Manufacturing Company, which was indebted to the defendants in the sum of about $6,200. At this interview the defendant Wimpfheimer testified that he inquired of Bab what construction was put by the company upon receiverships, and was informed that where a receiver was appointed the loss did not mature until the final decree in the action in which the receiver was appointed. Bab denied that there was any conversation whatever in regard to receiverships. The significance of this conversation is to be determined by reference to the terms of the bonds. The first contains the following proposition:

"The term 'insolvency of debtors,' wherever used in this bond, is understood to be general assignments of, or attachments against, insolvent debtors, the absconding of debtors, or executions in favor of the indemnified, returned unsatisfied."

The second bond differs somewhat, and reads as follows:

"The term 'insolvency of debtors,' wherever used in this bond, is agreed to be general assignments of, or attachments against, insolvent debtors, the absconding of debtors, and executions in favor of the indemnified, returned unsatisfied, except that, in cases of receivership, insolvency shall date from, and amount of loss must be shown by, final decree of court in the receivership proceedings."

It appears that on October 22, 1894, a petition had been filed by a majority of the directors of the Yonkers Hat Manufacturing Company, which was then indebted to the defendants on a sale made during the term of the first bond, for an order dissolving the corporation, of which petition the defendants had knowledge at the time of its filing. On the 29th of October an order was made appointing the defendant Wimpfheimer and another person temporary receivers of the corporation. The plaintiff claims that the concealment of these facts at the time of the application for the renewal was a suppression or concealment of a material fact, which was a fraud upon the plaintiff, and resulted in the issuing of the renewal. The original bond above quoted defined "insolvency" as occurring by general assignment of or attachment against insolvent debtors, the absconding of debtors, or unsatisfied execution in favor of the indemnified, while under the terms of the renewal, in addition to what has been stated, insolvency in cases of receivership was to date from, and amount of loss to be shown by, final decree of the court in the receivership proceedings. As each bond required loss to be an established fact, within its term, with certain exceptions therein stated, the

intent of the defendants at the time of the issuing of the renewal
becomes an important element in deciding the question of fraudu-
lent concealment, because no loss had occurred, within the term of
the first bond, at the time of its expiration, and the defendants
would be relegated to their rights under any renewal which might
be obtained.    We cannot, however, find sufficient evidence to justify
the allegation of false and fraudulent representation and conceal-
ment.    Fraud, in the suppression of a material fact, arises only
where one party to the contract fraudulently and intentionally con-
ceals from the adverse party something which he knows, and the
other party does not know, and which the first party was bound to
state, the suppression of which has induced the adverse party to enter
into the contract.    Suppressio veri, or concealment, will amount to
fraud where the concealment is of material facts, where there is
such a relation of trust and confidence between the parties that the
one party is under some legal or equitable duty to give full informa-
tion to the other, and which the latter has a right, juris et de jure, to
know, and then the withholding of such information purposely may
be a fraud.    Dambmann v. Schulting, 75 N. Y. 55, 62.    Where the
parties deal at arm's length, on equal terms, and no particular re-
lation of trust or confidence exists between them, there is usually
no obligation to speak, and either may remain silent and be safe.
Contracts of life and marine insurance stand on somewhat different
grounds from other contracts.    Mr. Parsons says:

"For, although one may have the right to be silent under ordinary circumstances,
there are many cases in which the very propositions of a party imply that certain
things, if not told, do not exist. This is peculiarly the case in contracts of in-
surance, where the insured is bound to state all facts within his knowledge which
would have influence upon the terms of the contract, and are not known, or may
be supposed by him not to be known, to the insurer. In these cases, and in others
which come within this principle, the suppressio veri has the same effect in law as
the expressio falsi." 2 Pars. Cont. 777.

But this rule is peculiar to such policies.    I find no authority for
extending it to all other contracts, and there is authority to the con-
trary:

"The rule which prevails in assurance upon ships and lives, that all material
circumstances known to the assured must be disclosed, though there be no fraud
in the concealment, does not extend to the case of guaranties. In the latter case,
the concealment, to vitiate the guaranty, must be fraudulent." Insurance Co. v.
Lloyd, 10 Exch. 522. "We think it is going too far to say that the creditor is, in
all cases, and without being inquired of, bound to communicate everything that
it is important for the surety to know, and that would increase his risk. Under
such a rule no one would ever know when he could rely on a bond, and it would
lead to a good deal of litigation." Etting v. Bank, 11 Wheat. 59.

Besides, the duty of the defendants when applying for a renewal
of the bond stands on a different basis from their duty in applying for
original insurance.    The first bond contains a provision for a re-
newal thereof, and for payment thereunder of losses on sales made
within the term of the first bond; and it was the plan and desire of
the company to secure the continuance of its business by renewals,
and the defendants elected to secure such renewal.    They were not
bound to declare the indebtedness and threatened insolvency of the
Yonkers Hat Company, and were not guilty of fraud in failing to do

so; all the more, that when the facts were declared, on the 3d of November, the plaintiff did not then elect to cancel its second bond. On the 3d of November, 1894, as required by the bond, the defendants notified the plaintiff that a temporary receiver of the Yonkers Hat Company had been appointed, and that they were creditors of that company for the sum of $6,200. But it was not until the 22d of March, 1895, when the final order had been entered in the suit for dissolution of the Yonkers Hat Company, that the plaintiff took steps to rescind, when it tendered back $225, the premium named in the bond, and gave notice of its intention to rescind the same. It appears that there was considerable difference of opinion between the parties as to whether the loss occurred under the first or second bond, and this difference appears to have existed in the minds of the parties at the time of the renewal. The plaintiff claims that the defendants, at the time of the issuing of the second bond, knew of the failure of the Yonkers Hat Company, and fraudulently and willfully concealed it from the plaintiff, for the purpose of inducing the latter to renew the bond, whereas, if that fact had been known to the plaintiff, it would not have renewed it. It must be observed, however, that, at the time of the issuing of the second bond, it was not certain that the entry of the final decree dissolving the corporation would occur within the life of such renewed bond. The fact that such decree was actually entered during the life of that bond does not change the condition of things which existed at the time of the renewal. At any rate, notice was given to the plaintiff on the 3d of November of the existence of the debt of the Yonkers Company, and of the appointment of temporary receivers, at which time, or within a reasonable time thereafter, the plaintiff was bound to exercise the right of rescission, if it so elected. It preferred, however, to stand by and speculate as to the chances, and to wait until by a final decree, whenever that might occur, the loss of the defendants became established within the life term of its bond, when, for the first time, it claimed to exercise its right to rescind. The company knew that the claim was barred by the terms of the first bond, because no claim for this loss had been made under it, although the bond itself provided that, unless notification of any loss was given within 20 days after knowledge of the insolvency of the debtor, the claim therefor should .be forever barred, and we may assume that it had this clause well in mind at the time of the renewal. The delay of five months was unauthorized, and unjust to the defendants. The plaintiff assumed the risk of final loss occurring during the life of the renewal, and upon its failure to rescind the defendants relied to their injury. They did not, as they might have done, obtain other indemnity from another similar company, in which they were also insured (this fact appears in the evidence), and this omission resulted from the failure of the plaintiff to notify them of its intention to rescind the bond. After the loss had occurred, and the liability of the plaintiff had become a fixed fact, within the life of the bond, it was too late to exercise the right of rescission. Such delay was a waiver, if not a ratification of the renewal, and the plaintiff was guilty of laches which estopped it to cancel the bond. ·

43 N.Y.S.—58

We find, therefore, that there was no fraudulent suppression of a material fact by the defendants, and that plaintiff was guilty of laches, in its attempt to rescind the contract, which has amounted to a waiver of such right, and that the judgment of the special term will not be disturbed. We do not express any opinion as to whether the plaintiff is liable for the loss in question, or as to which bond the loss is subject.

The judgment should be affirmed, with costs. All concur.